# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. BRITNEY HARRELL, </br></br>Plaintiff, </br></br>v. </br></br>UNIFIED RESIDENTIAL MANAGEMENT, LLC and ORO CAPITAL ADVISORS, LLC, </br></br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) </br></br> No. 2:23-cv-02009-SHL-cgc |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COMPLAINT AND DENYING AS MOOT PLAINTIFF'S SECOND MOTION TO EXTEND THE TIME TO AMEND COMPLAINT

Before the Court are Defendants Unified Residential Management, LLC and Oro Capital Advisors, LLC's Motion to Dismiss Complaint (ECF No. 27), filed October 17, 2023; Plaintiff United States of America ex rel Britney Harrell's response (ECF No. 49), filed July 17, 2024; Defendants' reply (ECF No. 50), filed July 31, 2024; Plaintiff's Second Motion to Extend the Time to Amend Complaint (ECF No. 40), filed November 14, 2023; and Defendants' response (ECF No. 44), filed November 28, 2023. For the following reasons, Defendants' motion to dismiss is **GRANTED**, and Plaintiff's motion to extend the time to amend is **DENIED AS MOOT**.

## BACKGROUND[1]

Plaintiff Britney Harrell worked as an assistant manager and manager at The Vale

---

[1] The facts are taken from Harrell's amended complaint (ECF No. 9) and are accepted as true for purposes of this motion. Defendants' response argues facts both contrary to and not stated in Harrell's pleading. (See, e.g., ECF No. 27-1 at PageID 128 ("The only condition placed upon a landlord who agreed to accept ERA funds . . . was the landlord could not evict the tenant for the non-payment.").) As Defendants are aware, their own allegations are not considered at this stage.

Apartments, a multi-family apartment complex in Memphis, Tennessee, managed by Defendant Unified Residential Management, LLC and owned by Defendant Oro Capital Advisors, LLC. (ECF No. 9 at ¶ 7.) As an assistant manager, Harrell managed the books and handled the "day-to-day accounting for tenants' rent payments." (Id.) As a manager, she oversaw operations, supervised evictions, and addressed tenants' complaints. (Id.) Harrell worked for Defendants during the COVID-19 pandemic, when tenants across the country struggled to pay their rent. (See ECF No. 9 at ¶¶ 7, 15–18, 27.)

In an effort to assist people at risk of losing their housing, Congress authorized Emergency Rental Assistance funding through the United States Department of the Treasury. (Id. at ¶ 15.) The Treasury distributed funds to the city of Memphis and Shelby County, who then distributed those funds to landlords through the Memphis and Shelby County Emergency Rental Assistance Program. (Id. at ¶¶ 16–17.) The Memphis program awarded funds to landlords for tenants who met certain eligibility requirements. (Id. at ¶ 17.)

Before awarding funds to cover rent for eligible tenants, the Memphis program required landlords to submit an electronic application to verify the tenancy with documentation like the landlord's W-9, the tenant's photo identification, and the lease agreement. (Id. at ¶ 18.) The landlord also agreed to temporarily halt the eviction process and promised to remove late fees. (Id.) The application required landlords to certify that their statements were true and that they would abide by the conditions of the Memphis program. (Id.) The application warned landlords that a false claim could lead to an action under the False Claims Act. (Id. at ¶ 19.)

After the Memphis program approved an application, it sent the funds directly to the landlord or the landlord's representative, who was then required to apply the total award to the tenant's account. (Id. at ¶ 20.) These payments typically came in the form of bulk settlement

checks containing the combined award for a group of approved tenants. (Id.) The tenants themselves only received a letter detailing the number of covered payments and the total amount paid by the program. (Id. at ¶ 21.)

Defendants hired S. Joshua Kahane to submit the required documentation on their behalf. (Id. at ¶¶ 22–23.)[2] Kahane negotiated with the Memphis program to obtain payments for Defendants' tenants. (Id. at ¶ 23.) In exchange, Plaintiff alleges that Defendants allowed Kahane to retain ten percent of the funds awarded to each tenant. (Id.) The Memphis program sent Defendants' bulk settlement checks directly to Kahane, who took his ten percent fee off the top before he issued checks on his law firm account to Unified Residential for the remaining funds. (Id. at ¶¶ 24–25.) Defendants knew about the reduction—indeed, they allowed it—but they failed to restore the ten percent balance to the affected tenants' accounts. (Id. at ¶ 25.)

The Vale's tenants complained to Harrell that they did not receive their full payment as described by the Memphis program and that late fees remained on their accounts. (Id. at ¶¶ 26–27.) Harrell then raised the issue with Shavaugh Sierras, an accountant for Oro Capital. (Id.) Sierras emailed documents to Harrell confirming that the accounts for several tenants were missing ten percent of their total award. (Id. at ¶ 28.) For her part, Sierras tried to contact the Memphis program twice to obtain information about the total amount awarded to each affected tenant so she could correct any discrepancies in their accounts.[3] (Id. at ¶¶ 29–30.) But before the program could provide any insight, Kahane directed Oro Capital to block further communication between the two. (Id. at ¶ 31.)

---

[2] Kahane works at the same firm as Defendants' counsel in this matter. (ECF No. 9 at ¶ 23.) Neither party raised a conflict of interest, so none is addressed.
[3] Harrell states that she has possession of all documents referenced in her First-Amended Complaint. (ECF No. 9 at PageID 38 n.1.)

After Kahane's intervention, Sierras and Harrell began working together to credit the missing ten percent back into the tenants' accounts. (Id. at ¶ 32.) Sierras credited the missing money to the tenants' residential ledgers by inputting a ten percent debit coded as "r-conone" with the description, "To correct charge code." (Id. at ¶¶ 33–34.) Harrell describes six different examples of Sierras's inputs on different residential ledgers.[4] (Id. at ¶ 34.)

Sierras and Harrell's efforts were short lived—after a few weeks of working together, Harrell learned that Oro Capital no longer employed Sierras. (Id. at ¶ 37.) But the complaints kept coming. (Id. at ¶ 38.) Tenant J.R. showed Harrell the letter J.R. received from the Memphis program promising an award of $5,944.06. (Id.) J.R.'s residential ledger only showed a deposit of $5,349.65. (Id.) Tenant T.T. showed Harrell the letter confirming an award of $9,887.00. (Id. at ¶ 39.) T.T.'s account only reflected a deposit of $8,898.33. (Id.) Each time, ten percent was missing and late fees remained. (Id.) Tenant P.K. even complained to the Tennessee Attorney General's Office, who then emailed Harrell about "rent assistance not being applied" to P.K.'s account. (Id. at ¶ 40.)

After receiving so many similar complaints, Harrell sent an email to Unified Residential listing the names of more than twenty tenants whose accounts did not reflect their total award.[5] (Id. at ¶ 43.) Not long afterwards, Unified Residential terminated Harrell's employment. (Id. at

---

[4] Harrell listed examples for the following tenants: J.L.; T.L.; L.T.; L.T.; T.C.; and T.C. (ECF No. 9 at ¶ 34.) Harrell also describes an encounter with tenant Q.I., who complained to her about a ten percent shortage in Q.I.'s account as of December 16, 2021. (Id. at ¶ 36.) Q.I. threatened to report Defendants if they did not correct the shortage. (Id.) Unified Residential's representative assured Q.I. that reporting would not be necessary. (Id.) On December 22, 2021, Sierras inputted the missing ten percent under the code "r-conone" with the description, "extra 901 money per Josh." (Id. at ¶¶ 36–37.)

[5] Harrell lists six different examples of tenants whose accounts did not reflect an adjustment like the one Sierras used to replace the missing ten percent of their total awards. (ECF No. 9 at ¶ 42.)

4

¶ 44.)   Harrell now brings this action under the False Claims Act. (Id. at ¶¶ 46–50.)  She also pleads state law claims under theories of unjust enrichment and payment by mistake.  (ECF No. 9 at ¶¶ 71, 73.)

Defendants moved to dismiss Harrell's FCA claims under Federal Rules of Civil Procedure 12(b)(6) and 12(c).  (ECF No. 27 at PageID 113–14.)  Should the Court dismiss her FCA claims, Defendants request dismissal of Harrell's state law claims under Rule 12(b)(1). (Id.)  Defendants argue that Harrell failed to plead an FCA claim under Rule 9(b)'s rigorous pleading requirements because she did not allege specific evidence of a representative claim presented to the Memphis program.  (ECF No. 27 at PageID 114–15.)  Defendants contend that, without this evidence, Harrell's allegations lack a connection to any fraudulent conduct on the part of Defendants.  (Id.)  In response, Harrell asserts that she pled each element of her FCA claims with specificity and particularity, emphasizing her personal knowledge of tenants' complaints and her recitation of their residential ledgers.  (ECF No. 49 at PageID 327–30.)

Harrell's amended complaint contains many details about Defendants' actions <u>after</u> they submitted applications to the Memphis program, but her failure to connect the dots to a specific representative application is fatal to her claims.  Because Harrell did not include a representative sample of Defendants' applications to the Memphis program containing the false claims she condemns, Defendants' motion to dismiss her FCA claims is **GRANTED**.  Without this representative sample—and in the absence of specific facts pled to support the inference that Harrell has personal knowledge of the application submission process—Harrell's allegations lack the foundation necessary to withstand their own weight.

Because the Court dismisses Harrell's federal claims, and because the Court does not have diversity jurisdiction over Harrell's state law claims, the Court also **DISMISSES** her claims

5

for unjust enrichment and payment by mistake. Moreover, Harrel's motion to extend time to amend is **DENIED AS MOOT**, given that she seeks an extension until after Defendants respond to discovery, and she is not to entitled to discovery until she can state a claim.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint.[6] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). An FCA complaint will survive a Rule 12(b)(6) motion if it "contains enough facts to state a claim to relief that is plausible on its face." United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 502 (6th Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court accepts the plaintiff's well-pleaded facts as true and "draw[s] all reasonable inferences in favor of the complaint"—indeed, a court cannot disbelieve the facts the plaintiff pled. Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 876 (6th Cir. 2006) (citing Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 563 (6th Cir. 2003)). But legal conclusions and unwarranted factual inferences are disregarded. Bledsoe, 501 F.3d at 502.

An FCA plaintiff must also comply with Rule 9(b). United States ex rel. Ibanez v. Bristol-Myers Squibb Co., 874 F.3d 905, 914 (6th Cir. 2017) (quoting Chesbrough v. VPA, P.C., 655 F.3d 461, 466 (6th Cir. 2011)). To comply with Rule 9(b), the plaintiff "must state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). An FCA plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Bledsoe, 342 F.3d at 643 (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161–62 (6th Cir.

---

[6] Because a motion for judgment on the pleadings generally follows the same standard as a motion to dismiss for failure to state a claim, a separate discussion under Rule 12(c) is not provided here. See Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 480 (6th Cir. 2020).

6

1993)). However, this heightened standard "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings." United States ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 504 (6th Cir. 2008) (quoting Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 678 (6th Cir. 1988)). While additional detail can be relevant, it is not necessary. SNAPP, 532 F.3d at 504.

## ANALYSIS

### I. FCA claims

The FCA imposes liability on anyone who knowingly makes a false or fraudulent claim to the federal government. 31 U.S.C. § 3729(a). The FCA's qui tam provision mobilizes "a posse of ad hoc deputies" by authorizing private citizens to prosecute frauds on the government's behalf. Sanderson, 447 F.3d at 876. The purpose of the qui tam provision is to encourage people with knowledge about fraud to come forward, and this encouragement comes with the potential for a personal recovery. Yuhasz, 341 F.3d at 562–63. But repeated amendments to the FCA demonstrate that Congress "walk[s] a fine line" between encouraging whistleblowing and discouraging opportunism. Sanderson, 447 F.3d at 876 (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)). The heightened pleading requirement under Rule 9(b) helps a court identify the valid claims that should proceed to discovery on their merits.

Harrell asserts that Defendants knowingly presented a false claim for payment under § 3729(a)(1)(A), knowingly made a false record material to a false claim under § 3729(a)(1)(B), and conspired to commit a violation of subsections (A) or (B) under § 3729(a)(1)(C).[7] However,

---

[7] Harrell also alleges an FCA claim against Defendants for fraudulent conversion under § 3729(a)(1)(D), which imposes liability on anyone who "has possession, custody, or control of . . . money used, or to be used, by the Government and knowingly delivers . . . less than all of

7

Harrell fails to sufficiently plead the first element under all three claims—the time, place, and content of the alleged misrepresentation. Because Harrell's FCA claims fail on their first step, the Court does not reach Defendants' arguments about materiality and falsity.

### A. 31 U.S.C. § 3729(a)(1)(A)

There are two ways to plead the time, place, and content of an alleged misrepresentation under § 3729(a)(2)(A). The first is to plead a specific representative example of the fraudulent claims presented to the government. Ibanez, 874 F.3d at 914. The second is to allege specific personal knowledge about the claim submission process, which supports a "strong inference" that the defendant "actually submitted" a false claim to the government. Id. at 915. The Court begins with the first option.

#### 1. Representative false claim submitted to the government

The FCA imposes a "strict requirement that relators identify actual false claims." Chesbrough, 655 F.3d at 472. A "claim" can be a request made to a grantee of a federal program for money provided by the federal government to advance the interests of the program. 31 U.S.C. § 3729(b)(2)(A)(ii)(I). To meet the pleading requirements, an FCA plaintiff must provide an example of a specific false claim because the FCA attaches liability to the claim for payment, not to the underlying fraudulent activity. Sanderson, 447 F.3d at 877–78. Thus, it is not enough

---

that money." 31 U.S.C. § 3729(a)(1)(D). To state an FCA conversion claim, the plaintiff must show that the defendant knew it was in possession of property belonging to the United States. United States ex rel. Harper v. Muskingum Watershed Conservancy Dist., 842 F.2d 430, 438–39 (6th Cir. 2016). Here, Harrell does not allege that the rental assistance payments belonged to the United States—indeed, her claims under § 3729(a)(1)(A) and (a)(1)(B) rely on the allegation that the funds belonged to Defendants' tenants. Neither party discussed Harrell's FCA conversion claim in detail in their respective filings—there is no reason to devote more ink to it here. Defendants' motion is **GRANTED** with respect to Harrell's FCA conversion claim under § 3729(a)(1)(D) and that claim is **DISMISSED**.

to detail a complex fraudulent scheme with particularity—the plaintiff must also plead the presentment of a false claim with particularity by providing actual "examples of specific false claims submitted to the government" in furtherance of the fraudulent scheme. Ibanez, 874 F.3d at 914.

The required "representative samples" must be "illustrative" of the class of claims covered by the fraudulent scheme. Bledsoe, 501 F.3d at 510–11. A plaintiff can satisfy this requirement by attaching to the complaint a fraudulent invoice for payment that the defendant submitted to the government. See United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc., 34 F.4th 507, 514 (6th Cir. 2022). But a plaintiff does not have to physically attach an example of a fraudulent claim to sufficiently plead her FCA claim. As long as a plaintiff alleges the "time, place, and content" of a representative false claim, she has pled the first element of her FCA action. Bledsoe, 501 F.3d at 509.

Defendants first argue that Harrell failed to identify a claim because Harrell did not allege that Defendants ever made a request for money to the government or anyone else. (ECF No. 27 at PageID 128.) Indeed, throughout Defendants' response, they assert that the tenants themselves made the requests for rental assistance, not the landlords. (See, e.g., ECF No. 27-1 at PageID 127.) But Harrell specifically pled that Defendants were required to submit applications for rental assistance to receive any funds. (ECF No. 9 at ¶ 18.) At this stage, Harrell's well-pled facts are deemed true—Defendants' allegations to the contrary are disregarded.

Defendants also assert that there is no claim for payment as defined by the FCA because rental assistance was the subject of an agreement between Defendants and the Memphis program, not between Defendants and the federal government or any grantee of a federal program. (ECF No. 27 at Page ID 116.) This argument is without merit. The Memphis program

9

received federal funds as an eligible grantee of the Emergency Rental Assistance program, and the Treasury disbursed those funds to advance the interests of that program—namely, to assist people at risk of losing their housing. (ECF No. 9 at ¶¶ 15–17.) Defendants requested these federal funds from the Memphis program. (Id. at ¶¶ 22–25.) Thus, Defendants requested federal funds from a grantee of a federal program who received those funds to advance the interests of that program. Harrell sufficiently pled that Defendants made a claim as defined by the FCA. See 31 U.S.C. § 3729(b)(2)(A)(ii)(II).

Next, Defendants argue that Harrell needed to answer a long list of exhaustive questions about the claim, including whether the claim was made in writing, in an email, or over the phone; and who specifically made the claim. (ECF No. 27-1 at PageID 131.) However, these kinds of details go beyond what the FCA requires. Bledsoe, 501 F.3d at 506 ("A requirement that a relator identify specific employees is dissimilar from a requirement that a relator identify specific false claims in every material respect."). The FCA does not require Harrell to identify the specific person who submitted Defendants' applications for rental assistance, and it does not require her to allege details about the form of the claim. See Bledsoe, 501 F.3d at 506.[8]

Indeed, the issue with Harrell's pleading is not that she did not identify every minute detail about the claims—the issue is that she did not identify a specific example of a submission to the program. According to the pleading requirements for FCA claims, Harrell must plead that Defendants submitted an application to the Memphis program for an identified tenant for a specific amount of rental assistance on a specific day. Harrell must also allege that, as a

---

[8] Even if those were requirements, Harrell satisfied them. Harrell pled that Defendants hired an attorney representative, S. Joshua Kahane, to submit rental assistance applications to the program on Defendants' behalf. (ECF No. 9 at ¶¶ 22–25.) And Harrell pled that the applications themselves were electronic. (Id. at ¶ 28.)

10

condition of receiving rental assistance for a specific tenant, Defendants promised that they would deposit that tenant's total award into the tenant's account and eliminate their late fees. Harrell did not plead such an example.

Without a representative false claim, Harrell cannot state a claim for relief. United States ex rel. Prather v. Brookdale Senior Living Comms., Inc., 838 F.3d 750, 768–69 (6th Cir. 2016) ("Prather II"). In Prather, for example, the plaintiff pled that the defendant hired her to review documentation for thousands of backlogged Medicare reimbursement claims. Id. at 757. During her review, the plaintiff noticed that the defendant waited months to find a physician willing to retroactively sign off on care that a physician never authorized, which violated Medicare's requirement for a prompt physician certification. Id. To support her allegations of fraud, the plaintiff pled 489 examples of different patients who received care without physician certification.[9] Id. at 758–59. The plaintiff pled that Patient A "received home health care services from December 4, 2011, through February 11, 2012," but "no doctor certified that she needed home health services until June 29, 2012."[10] Id. The plaintiff alleged that the defendant submitted a request for anticipated payment for Patient A's care in December 2011, and later sent Medicare a final reimbursement request of $800. Id. at 759. The Sixth Circuit held that the plaintiff did not plead a specific example of a false claim with particularly because she did not provide an exact billing date for the request for anticipated payment, the specific basis for the

---

[9] The plaintiff identified each patient's name, the start date of care, the end date of care, the name of the defendant's entity that provided care, and the name of the defendant's community at which the patient resided. United States ex rel. Prather v. Brookdale Senior Living Comms., Inc., No. 3:12–CV–00764, 2015 WL 6812581, at *14 (M.D. Tenn. Nov. 5, 2015) ("Prather I").

[10] The plaintiff also alleged that Patient A was a dementia patient living in a secured memory unit in Chandler, Arizona; she was diagnosed with an abnormal gait in her care plan but did not receive physical therapy; and she received medication education that was inconsistent with her dementia diagnosis. Prather I, 2015 WL 6812581, at *9.

request, or the requested amount. Id. at 768–69 ("Although Prather alleged significant detail regarding the fraudulent scheme, her involvement in reviewing patient documentation for submission for Medicare payment, and the details of the alleged deficiencies in the documentation that she reviewed about specific patients, . . . Prather did not allege information regarding the key fact that our cases have identified: [t]he actual submission of a specific request for anticipated payment to the government.").

Harrell's complaint suffers from the same problem as the complaint in Prather. Even though she identifies tenants who showed her their award letters from the Memphis program, and even though she pleads the details of Defendants' failure to properly credit those awards to the tenants' accounts, she never pleads with specificity the key requirement for an FCA claim—the false claim submitted to the government.

Harrell's allegation that Defendants applied for rental assistance, without specific facts to support it, equates to an allegation that Defendants must have submitted false claims at some point. See United States ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 412 (6th Cir. 2016) (dismissing the complaint where the plaintiff alleged that the defendant falsely certified that it had complied with the HITECH Act to collect federal funds but did not identify an example of a specific false claim for payment). Defendants assert that Harrell's claim is based on the idea of post hoc ergo propter hoc (ECF No. 27-1 at PageID 130), and the Court agrees. Without a representative sample, the Court is required to assume that, because Defendants received payments for rental assistance, and because tenants complained that Defendants did not apply their total award to their accounts or remove their late fees, Defendants must have engaged in fraud to get the funds.

However, Rule 9(b) does not allow Harrell to "merely describe a private scheme in

detail" but then simply allege that "claims requesting illegal payments must have been submitted, were likely submitted, or should have been submitted." See Sanderson, 447 F.3d at 877. Harrell needed to connect the dots by pleading a representative example of a specific application that Defendants submitted for a specific tenant on a specific date for a specific amount containing the specific false claims at issue—namely, that Defendants promised to remove late fees and credit the total amount of rental assistance to that tenant's account.[11] See Bledsoe, 501 F.3d at 515 (finding a representative example adequately pled when the plaintiff alleged that the defendant submitted a fraudulent secondary diagnosis of Tachycardia under DRG code 96 for patient "MAL" on December 9, 1997).

      Here, Harrell does not even allege where the condition requiring Defendants to make a specific entry on tenants' accounts can be found, or when Defendants agreed to it. Harrell's pleading raises an inference that a false claim must have been submitted because she saw the letters that the tenants received confirming payment from the Memphis program, but the Court cannot look backwards from the letters to infer a fact that Harrell must plead with specificity.

      Rule 9(b) requires an FCA plaintiff to sufficiently plead the entire chain "from start to finish" to fairly show that a defendant submitted a false claim. Ibanez, 874 F.3d at 914. While Harrell alleges a sinister overall scheme, she fails to plead the start of it, the false claim itself. The Court cannot rely on the existence of the sinister scheme to infer that a false claim must have been submitted—it was Harrell's job to plead it. Without a representative example, Harrell

---

[11] Defendants argue that Harrell cannot foreclose the possibility that Defendants received this rental assistance from sources other than the Memphis program. (ECF No. 27 at PageID 131 n.18.) However, Harrell pled that she saw some of the letters the Memphis program sent to Defendants' tenants confirming payment from the Memphis program. (ECF No. 9 at ¶¶ 21, 30, 38–39.) The question that remains here is not whether Defendants received money from the Memphis program for some of the tenants who did not receive the full amount of their respective awards—instead, it is whether Defendants submitted a false claim to receive those funds.

cannot state a claim under the FCA unless she can show that she has personal knowledge of the application submission process, which gives rise to a strong inference that Defendants actually submitted a false claim to the Memphis program. The Court turns to this standard.

### 2. Personal knowledge of the claim submission process

When a plaintiff is unable to plead a specific example of a false claim submitted to the government, she can still plead an FCA claim if she can show that she has sufficient personal knowledge to support a strong inference that the defendant actually submitted a claim. Prather II, 383 F.3d at 769. A strong inference that the defendant submitted a false claim arises when the plaintiff alleges specific personal knowledge about the defendant's claim submission process. Id. It is not enough to allege personal knowledge of the fraudulent scheme—the plaintiff must allege personal knowledge of the claim submission process itself. Ibanez, 874 F.3d at 916. This personal knowledge can be based on the plaintiff's direct involvement in the claim submission process or conversations with people who submitted the claims. Prather II, 383 F.3d at 769.

Prather is the only case in which the Sixth Circuit held that the plaintiff pled sufficient personal knowledge to create a strong inference that the defendant submitted false claims. Ibanez, 874 F.3d at 915. There, the plaintiff pled that the defendant hired her to review and draft false claims submitted to Medicare, she pled specific examples that established her detailed knowledge about billing and treatment documentation, and she pled that she received direct confirmation that the defendant submitted the final claims she reviewed to Medicare for payment. Prather II, 838 F.3d at 770. Even though the plaintiff could not plead an example of a specific claim submitted to Medicare with particularity, she pled specific facts about her knowledge of the billing process that gave rise to a strong inference that the defendant submitted false claims. Id.

14

Here, Harrell asserts that she adequately pled facts showing her personal knowledge of the fraudulent claims because she stated that she handled the accounting for rent payments, she received tenant complaints about shortages in their accounts, she saw letters from the Memphis program confirming specific awards for certain tenants, and she saw a spreadsheet demonstrating that Defendants transferred ten percent of the tenants' rental assistance to a special account labeled "bad debt recovery." (ECF No. 49 at PageID 328–30.) However, the problem with Harrell's complaint is not that Harrell did not demonstrate her personal knowledge about the ways in which Defendants billed their tenants—she clearly did.

The problem is that Harrell did not plead how and what she knows about the ways in which Defendants applied for rental assistance. See United States ex rel. Marlar v. BWXT Y-12, L.L.C., 525 F.3d 439, 446 (6th Cir. 2008) (dismissing the plaintiff's complaint because she did not allege personal knowledge about the defendant's procedures for submitting reports to the government), with Prather II, 838 F.3d at 770 (reversing dismissal of the plaintiff's complaint because she alleged that she worked on the claims themselves and received confirmation of their submission to the government). Unlike the plaintiff in Prather, Harrell does not plead that she worked on the rental assistance applications, or even that someone told her about them.

Because Harrell did not plead facts to support her knowledge about Defendants' process for applying for rental assistance, her allegations do not give rise to a strong inference that Defendants actually submitted false claims. Knowledge about the fraudulent scheme itself is not sufficient. A court cannot infer that the defendant submitted a false claim when the plaintiff only pleads the timeframe of fraudulent submissions, the place and content of the fraud, and details about the fraudulent scheme. Chesbrough, 655 F.3d at 471. These kinds of generalities do not demonstrate personal knowledge about the claim submission process itself. Id. Just because

15

Defendants may have maintained "sloppy . . . records" does not mean that they submitted false claims. See Marlar, 525 F.3d at 448.

Harrell's amended complaint fails to state a claim under § 3729(a)(2)(A) and thus the motion to dismiss that claim is **GRANTED**. The Court next addresses Harrell's second claim under the FCA.

### B.     31 U.S.C. § 3729(a)(2)(B)

Proof of a false claim is required under § 3729(a)(2)(B). Marlar, 525 F.3d at 447. A plaintiff must plead a connection between an actual claim made to the government and the alleged fraud. Ibanez, 874 F.3d at 916. This connection must be "evident." Id. However, a plaintiff is not required to plead that the defendant itself presented the false claim to the government. Chesbrough, 655 F.3d at 472–73.

Instead, a claim under this subsection of the FCA contemplates a situation in which the defendant is a subcontractor who submits a false statement to a prime contractor with the intent that the statement be used by the prime contractor to get the government to pay the claim. Id. (quoting Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 671 (2008)). But the elimination of the requirement to plead the act of presenting the claim does not negate the requirement that the plaintiff plead with specificity the false claim itself. Id.

Here, Harrell's allegations do not contemplate the situation addressed by § 3729(a)(1)(B). She does not allege that Defendants are in a position similar to subcontractors who make false statements to another entity that are material to the government's decision to pay a claim. For Harrell's claim to fall under this subsection, she would need to assert that the landlords made a false statement as part of the tenant's application, which the tenant then submitted to the government. However, Harrell asserts that Defendants themselves submitted their rental

16

assistance applications to the government. (ECF No. 9 at ¶ 52.) Harrell cannot skirt the requirement under § 3729(a)(1)(A) to show a specific claim presented to the government by simply pleading the same claim under the second subsection. See Chesbrough, 655 F.3d at 472–73. This second subsection is not a fallback provision for plaintiffs who cannot plead a prima facie case under § 3729(a)(1)(A). Thus, this aspect of Defendants' Motion to Dismiss is also **GRANTED**. The Court turns to Harrell's final FCA claim.

    **C.**    **31 U.S.C. § 3729(a)(1)(C)**

To plead an FCA conspiracy claim under § 3729(a)(1)(C), the plaintiff must show that the defendant made an agreement to violate the FCA. Ibanez, 874 F.3d at 917. It is not enough to plead that the defendant entered into an agreement that made it likely that there would be an FCA violation. Id. Rather, the plaintiff must present a specific statement showing that the defendant entered into a plan to defraud the government. Id. Without a conspiratorial statement, and in the absence of an adequately plead violation of any other FCA provision, an otherwise bare allegation that a defendant entered into a conspiracy to violate the FCA is insufficient. Id.

Here, Harrell does not allege that an agent of either Defendant made a specific statement to enter into a conspiracy to violate the FCA. She simply pleads that Defendants "conspired with themselves and others to have false claims paid by the United States." (ECF No. 9 at ¶ 56.) Harrell does not even specifically allege the identities of the other conspirators, if any exist. (Id.) Because she does not plead a conspiratorial statement with specificity, and because she cannot state a claim under any other subsection of the FCA, Defendants' Motion to Dismiss this claim is also **GRANTED**.

Harrell's only remaining claims arise under state law. The Court next considers whether to exercise supplemental jurisdiction to hear those claims in the absence of her FCA claims.

## II.     Supplemental jurisdiction over state law claims

A federal court can decline to exercise supplemental jurisdiction over a state law claim if the court dismissed all the plaintiff's federal claims.  28 U.S.C. § 1367(c)(3).  After the dismissal of all federal claims, a court should usually dismiss the remaining state law claims unless other considerations warrant the exercise of supplemental jurisdiction.  Gamel v. City of Cincinnati, 625 F.3d 949, 952 (6th Cir. 2010) (quoting Musson Theatrical, Inc. v. Fed. Exp. Corp., 89 F.3d 1244, 1254–55 (6th Cir. 1996)).

If the parties already completed discovery, or there are summary judgment motions ripe for decision, a court may decide to keep the case in federal court, even in the absence of a federal claim.  Id.  Here, the parties have not completed discovery, and there are no pending summary judgment motions before the Court.  There is no reason to retain jurisdiction over Harrell's state law claims this early in the litigation process.  Thus, Harrell's claims for unjust enrichment and payment by mistake are **DISMISSED**.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **GRANTED** and Harrell's complaint is **DISMISSED WITHOUT PREJUDICE**.  Because Harrell's Second Motion to Extend the Time to Amend Complaint does not indicate an intent to amend that would cure the fatal flaws here, it is **DENIED AS MOOT**.

**IT IS SO ORDERED,** this 30th day of September, 2024.

s/ Sheryl H. Lipman<br>
SHERYL H. LIPMAN<br>
CHIEF UNITED STATES DISTRICT JUDGE